# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*In re Angela A.*, 2013 IL App (4th) 120786

---

| | |
|---|---|
| Appellate Court Caption | In re: ANGELA A., a Person Found Subject to the Administration of Psychotropic Medication and Involuntary Admission, THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. ANGELA A., Respondent-Appellant. |
| District & No. | Fourth District<br>Docket Nos. 4-12-0786, 4-12-0787 cons. |
| Filed | September 5, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's orders for respondent's involuntary hospitalization and involuntary administration of psychotropic medication were reversed based on the State's admission that the trial court erred in denying respondent's motion for an independent psychological examination. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, Nos. 12-MH-610, 12-MH-645; the Hon. April Troemper, Judge, presiding. |
| Judgment | No. 4-12-0786, Reversed.<br>No. 4-12-0787, Reversed. |

Counsel on
Appeal

Veronique Baker, of Guardianship and Advocacy Commission, of Chicago, and Andreas Liewald and Matthew Davison, both of Guardianship and Advocacy Commission, of Hines, for appellant.

John Milhiser, State's Attorney, of Springfield (Patrick Delfino, Robert J. Biderman, and James C. Majors, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE APPLETON delivered the judgment of the court, with opinion.
Justices Knecht and Turner concurred in the judgment and opinion.

**OPINION**

¶ 1    Following an August 2012 hearing, the trial court found respondent, Angela A., subject to involuntary hospitalization (405 ILCS 5/3-700 (West 2010)) and involuntary administration of psychotropic medication (405 ILCS 5/2-107.1 (West 2010)). Respondent appeals, arguing (1) the trial court failed to comply with section 3-804 of the Mental Health and Developmental Disabilities Code (Mental Health Code) (405 ILCS 5/3-804 (West 2010)) when it denied respondent's request for an independent mental-health examination; (2) the trial court failed to comply with section 3-816 of the Mental Health Code (405 ILCS 5/3-816 (West 2010)) when it failed to make adequate oral or written findings of fact and conclusions of law in its orders; and (3) the State failed to prove by clear and convincing evidence that respondent lacked the requisite capacity to make a reasoned decision about her treatment (405 ILCS 5/2-107.1(a-5)(4)(E) (West 2010)). The State concedes error on respondent's first two grounds. We accept the State's concession and reverse the trial court's orders.

¶ 2                                    I. BACKGROUND

¶ 3    Respondent was admitted to St. John's Hospital in Springfield in March 2012 because she was experiencing psychotic episodes. She gave birth while in the hospital and the Illinois Department of Children and Family Services took the infant into protective custody. Respondent was discharged from the hospital in May with a prescription for Haldol. She reportedly failed to take her medication and was admitted to Memorial Medical Center in July 2012 after the police responded to her residence when she threatened to kill her roommate.

¶ 4    On July 26, 2012, a Sangamon County sheriff's deputy filed a petition for respondent's involuntary admission (Sangamon County case No. 12-MH-610). The petition alleged respondent suffered from a mental illness and (1) because of her illness, she was reasonably

-2-

expected to engage in conduct placing her or another in physical harm or in the reasonable expectation of being harmed; (2) because of her illness, she was unable to provide for her basic physical needs without assistance so as to guard herself from serious harm; (3) she was refusing treatment and because of her illness, she was unable to understand her need for treatment and if untreated, she was expected to suffer mental or emotional deterioration. According to the petition, respondent was in need of immediate hospitalization for treatment and the prevention of harm. The petition was accompanied by two certificates completed by emergency room physician Dr. John Holland and McFarland Mental Health Center psychiatrist Dr. Arden D. Barnett. Both doctors opined that respondent was in need of immediate hospitalization to treat her mental illness.

¶ 5        On August 5, 2012, Dr. Aura Eberhardt, a psychiatrist at McFarland, filed a petition for the involuntary administration of psychotropic medication (Sangamon County case No. 12-MH-645). Dr. Eberhardt alleged respondent refused medication to treat her mental illness, and without treatment she would continue with her paranoia and psychotic state. According to Dr. Eberhardt, respondent lacked the capacity to make a reasoned decision about her treatment. The doctor sought to administer two medications (Zyprexa and Ativan) to relieve symptoms of psychosis and agitation, respectively, and Cogentin, as needed, to relieve any associated side effects. As alternatives, the doctor would try Haldol and risperidone. According to Dr. Eberhardt, the benefits of the drugs outweigh the potential harm.

¶ 6        On August 10, 2012, the trial court and the parties convened for a hearing on both petitions. However, respondent requested a continuance for the purpose of obtaining an independent psychiatric examination. The court allowed the continuance.

¶ 7        On August 17, 2012, the parties reconvened and the trial court proceeded with a hearing on both petitions, considering the involuntary-admission petition first. The prosecutor advised the court that psychiatrist Dr. Zhihong Zhang had filed a second-opinion report based upon his examination of respondent. (Dr. Zhang's report was not admitted into evidence.) Respondent and her counsel advised the court she wished to have an independent evaluation by a doctor of her choice, rather than a doctor of the State's choice. The court asked if respondent was requesting a continuance. Without answering the court's question, respondent's counsel said: "I don't think–in good faith, Your Honor, she has a right to an independent evaluation, but I don't think she has a right to pick the physician of her choice so–." The prosecutor clarified that respondent could choose her own physician if she paid for the examination. If respondent wanted the State to pay for it, then Dr. Zhang was the choice. Without resolving the issue, the court proceeded to consider evidence on the merits of the first petition.

¶ 8        On the petition for involuntary admission, the State called Dr. Aura Eberhardt, respondent's treating psychiatrist. She said respondent was diagnosed with schizoaffective disorder, bipolar type in 2000 and she currently suffers from paranoid delusions and grandiose delusions. Respondent believes physicians from SIU School of Medicine (SIU) had been stealing eggs from her ovaries, using them to create babies, and selling the babies on the black market. According to Dr. Eberhardt, respondent had been hospitalized for her mental illness on at least five occasions with the last hospitalization in March 2012. She remained hospitalized for two months and was treated with the psychotropic medication

-3-

Haldol. She was released with a prescription for the same.

¶ 9    Dr. Eberhardt said she began treating respondent within a week of her admission to McFarland on July 26, 2012. Respondent informed the doctor she did not take her medication because she did not need it, she was not ill, and she did not need treatment. Based on respondent's position, the doctor opined it was clear respondent was unable to understand her need for treatment due to her mental illness. Further, if not treated on an inpatient basis, respondent was reasonably expected to suffer mental or emotional deterioration and be unable to provide for her basic physical needs.

¶ 10    At the time of respondent's recent admission to the hospital, she was residing with a friend, who had advised the social worker he could no longer allow respondent to reside in his home. When Dr. Eberhardt posed the question to respondent about where she would reside upon release, respondent would not "share with us any information." She suffered from paranoia and insisted she worked as a police informant and that the government spied on her through the use of her Link card. She claimed her husband (though she is not married) was very rich. Because of his wealth, she surrendered her section 8 housing. Other than this information, respondent refused to disclose where she would live or how she would provide for herself. Her hygiene and diet were satisfactory.

¶ 11    In Dr. Eberhardt's opinion, respondent was in need of hospitalization to protect herself and others from harm. She was unable to live on her own without treatment. A treatment plan was formulated for her. She was not a candidate for a group home or a nursing home at this time. In fact, the doctor testified hospitalization was the least restrictive treatment alternative for respondent. The State introduced as an exhibit a prepared social investigation, psychiatric history, and treatment plan. Dr. Eberhardt recommended that respondent be involuntarily committed for a period not to exceed 90 days.

¶ 12    Respondent testified she was 35 years old and had been at McFarland for approximately three weeks. She was hospitalized because "someone made a false statement" and said she had threatened to kill someone. She denied making the threat. She said she had not been compliant with her medication because she was not a psychotic person and she functions better without it. She explained she had made enemies as a police informant and she had been beaten up and raped because of it. When she was most recently hospitalized, she was in the process of trying to find a place to live and to reconcile with her husband. She said: "we went to make a movie and we were persecuted and beaten up. And we separated for a long time. I had to receive some therapy." She said she receives Social Security income and could "very easily" find a place to stay on her own or with family. She agreed it was "possible" she would be at a risk of harm if released because of her enemies. She said "SIU does not care for me because they, in fact, were coming into my apartment. They came in with some anesthesia. They have a long tube with a vac cord on it, and I know how they do it because they did it to me before. And they–they ask you first. And then when you don't, when you don't allow it, they come in anyway. And that's what they were doing."

¶ 13    On cross-examination, respondent admitted she had a mental illness in the past but she has since "recovered." The prosecutor asked about respondent's comment regarding SIU. Respondent said: "They were coming in with, it's a suction. *** Anesthesia, they come in

and they come to retrieve female reproductive." She said "they have been doing this to [her] like for years" and "they were roping people in through a false network." When asked about her experience of being in a movie, she explained:

> "I've made a few movies. I got to, I signed a contract with a person named Amen Hummaideh. And I–he made a–and I've made a few. I was a stunt person. And then we–he had mentioned–we were making a film about Christ, and we were doing reenactments. And I signed a waiver and everything for–and I was actually put on a cross, and they beat us up. But I survived. And it caused a lot of damage. And there was some, not damage, but it took a long time to get over that."

¶ 14 After considering the evidence, the trial court found respondent was a person with a mental illness who, because of her illness, does not understand her need for treatment. If she was not treated, the court found, it was reasonably expected she would deteriorate mentally and emotionally. The court ordered respondent committed to hospitalization for a period not to exceed 90 days.

¶ 15 On the petition for the involuntary administration of psychotropic medication, the State again called Dr. Eberhardt. She repeated much of her testimony regarding respondent's symptoms of paranoia and grandiose delusions, her mental-health history, and her prior hospitalizations. The doctor confirmed that respondent was refusing treatment and she lacked the capacity to understand her need for treatment. Dr. Eberhardt explained respondent's treatment plan and the alternatives, if needed. Respondent had previously been treated with Haldol and suffered no adverse side effects. Dr. Eberhardt testified she discussed the treatment plan with respondent but respondent refused to take the medication and insisted she did not need it. Regardless, the doctor reviewed with respondent the benefits and potential side effects of the proposed medication. She gave respondent a list of the same, but again respondent insisted she did not need the medications because, according to the doctor, respondent said "she 'come[s] from British royalty and her husband comes from David.' "

¶ 16 Dr. Eberhardt opined, to a reasonable degree of psychiatric certainty, that the requested treatment outweighed the potential harm "because without treatment, her symptoms will continue and worsen and she will place herself in danger." Further, she testified that medication was the least restrictive treatment option available for respondent. The doctor stated that even if respondent participated in group therapy, those group sessions would not address respondent's psychotic symptoms.

¶ 17 Respondent again testified on her own behalf. She acknowledged she had been hospitalized before due to her mental illness and that she had taken numerous medications with "many, many side effects." She said many of the medications created "a false mood" and prevented her from thinking clearly. She believed holistic medications and remedies, along with a proper diet and exercise, were more effective. She complained the side effects of the medications she had taken previously "turned [her] into like, almost put [her] in like a retardative [*sic*] state. [She] couldn't function properly. [She] had children and they were–put it this way, [she] could not get out of bed on most days, it had [her] so sedated. And that made it easier for when the SIU wanted to come or [her] ex wanted to come and have his way with [her] on his lunch break after [her] telling him no."

¶ 18    After considering the evidence, the trial court stated:

"The court finds that [respondent] is suffering a serious mental illness, that she is exhibiting deterioration of ability to function and is suffering, the illness has lasted for a period of time and these symptoms still exist. The respondent has refused to take medications. Respondent was given a list of proposed and alternative medications, including the dosages and benefits and risks associated with all proposed medication. The doctor verbally explained or at least attempted to explain the benefits and side effects. The court finds that the benefits of treatment will outweigh the potential harm of the side effects. The respondent lacks capacity to give informed consent at this time. Other less restrictive services were explored and found inappropriate. And, therefore, forced medication is the less restrictive course of treatment available at this time. Testing and/or procedures are essential for the safe and effective administration of treatment, and a good faith attempt was made to determine whether the patient executed a power of attorney for health care and/or a declaration for mental-health treatment. And this order is not to exceed 90 days."

After the court announced its decision and advised respondent of her right to appeal, the court stated: "I know you said you wanted a second opinion, and one is in the court file in your first case. If you still–*** if you're still wanting someone else to examine you, if you have your own funds and can hire your own physician, you always have that right." These appeals followed and were consolidated.

¶ 19                                    II. ANALYSIS

¶ 20                                    A. Mootness

¶ 21    We first acknowledge that respondent's appeal is moot, as both trial court orders were only valid for 90 days and that period has expired. Respondent admits the orders are moot, but she claims review should be had under an exception to the mootness doctrine. The State agrees that at least one of the following named exceptions would indeed apply to this case.

¶ 22    There are three potentially applicable exceptions to the mootness doctrine: (1) the public-interest exception, (2) the capable-of-repetition exception, and (3) the collateral-consequences exception. *In re Alfred H.H.*, 233 Ill. 2d 345, 355-63 (2009). The public-interest exception applies if the respondent clearly shows that (1) the question is of great public importance, (2) there is a need for an authoritative decision to provide guidance, and (3) the situation is likely to recur in other cases. *Alfred H.H.*, 233 Ill. 2d at 355. "The public-interest exception considers potential recurrences to any person, not only the complaining party." *In re Shelby R.*, 2012 IL App (4th) 110191, ¶ 18.

¶ 23    In this appeal, respondent challenges the trial court's compliance with two statutory sections within the Mental Health Code. As this court has stated:

"Given that (1) strict compliance with statutory procedures is required based on the important liberty interests involved in involuntary-treatment cases [citation] and (2) our supreme court has stated that 'the procedures courts must follow to authorize the involuntary medication of mental[-]health patients involve matters of "substantial public concern" ' [citations], respondent's arguments regarding the involuntary-treatment

-6-

order's compliance with the Code constitute questions of public importance. In addition, answers to respondent's arguments will provide an authoritative determination to guide public officers in the performance of their duties in mental-health cases. Finally, the circumstances in this case are likely to recur in other involuntary-treatment cases." *In re Atul R.*, 382 Ill. App. 3d 1164, 1168 (2008).

¶ 24 As this court found in *Atul*, we likewise find here that respondent satisfied the criteria of the public-interest exception to the mootness doctrine. Therefore, we need not address the remaining two exceptions.

¶ 25 B. Compliance With Section 3-804

¶ 26 Respondent first claims the trial court failed to comply with section 3-804 of the Mental Health Code (405 ILCS 5/3-804 (West 2010)) when it denied respondent's request for an independent examination. Section 3-804 provides:

"The respondent is entitled to secure an independent examination by a physician, qualified examiner, clinical psychologist or other expert of his choice. If the respondent is unable to obtain an examination, he may request that the court order an examination to be made by an impartial medical expert pursuant to Supreme Court Rules or by a qualified examiner, clinical psychologist or other expert. Any such physician or other examiner, whether secured by the respondent or appointed by the court, may interview by telephone or in person any witnesses or other persons listed in the petition for involuntary admission. The physician or other examiner may submit to the court a report in which his findings are described in detail. Determination of the compensation of the physician, qualified examiner, clinical psychologist or other expert and its payment shall be governed by Supreme Court Rule." 405 ILCS 5/3-804 (West 2010).

¶ 27 The State concedes error, agreeing that respondent requested an independent examination with a physician of her choice and the trial court did not determine whether respondent was "unable to obtain an examination" before proceeding with the hearing. 405 ILCS 5/3-804 (West 2010). At the first scheduled hearing, on August 10, 2012, the trial court allowed a continuance upon respondent's request, and a "second opinion" was obtained, but it was obtained by a psychiatrist of the State's choosing. At the next scheduled hearing, respondent again requested a continuance to allow for an independent examination by a physician of her choice. The parties briefly discussed whether respondent was entitled to the same, even if she was unable to pay for it. Without resolution, and without any indication that respondent was unable to pay for the examination, the court ended the discussion and proceeded to conduct the hearing on the State's petition for involuntary admission. However, after the court ruled on the involuntary treatment petition, it advised respondent she could still obtain an independent examination with a physician of her choice if she had the funds to pay.

¶ 28 In *In re Margaret S.*, 347 Ill. App. 3d 1091, 1096 (2004), the Fifth District found that the trial court had erred when it granted the respondent's motion for an independent examination *after* the hearing on the State's petition for involuntary treatment. The court held that a continuance should have been granted to allow the examination requested by the respondent. *Margaret S.*, 347 Ill. App. 3d at 1096. Indeed, Illinois courts have determined that a

respondent is entitled to an independent examination *prior to* a hearing on a petition for involuntary admission and a hearing on a petition for involuntary treatment. See *In re R.C.*, 338 Ill. App. 3d 103, 110 (2003) (concluding the trial court had no discretion to deny the respondent his statutory right to an independent psychological examination at a hearing for involuntary treatment).

¶ 29　　Because respondent had an absolute right to an independent examination by a physician of her choice, and because the trial court did not see the issue to a conclusion (that is, the court did not determine whether respondent was able to obtain an examination before it proceeded to a hearing on the State's petition), we accept the State's concession and find the court erred. We therefore reverse the trial court's orders of involuntary admission and the involuntary administration of psychotropic medication. Our conclusion that the trial court committed reversible error by denying respondent's motion for an independent psychological examination eliminates the need to discuss respondent's alternative claims of error.

¶ 30　　　　　　　　　　　　　III. CONCLUSION

¶ 31　　For the foregoing reasons, we reverse the trial court's judgment in appellate court case No. 4-12-0786 and reverse the court's judgment in appellate court case No. 4-12-0787.

¶ 32　　No. 4-12-0786, Reversed.

¶ 33　　No. 4-12-0787, Reversed.